**In re GENERAL DEVELOPMENT CORPORATION BOND LITIGATION.**

**This Document Relates To All Actions.**

**91 Civ. 0594 (LMM).**
**MDL No. 890.**

United States District Court,
S.D. New York.

July 8, 1992.

Scott Fisher, Garwin, Bronzaft, Gerstein & Fisher, Mordecai Rosenfeld, P.C., New York City, Elwood S. Simon & Associates, P.C., Bloomfield, Mich., for plaintiffs.

Joel F. Hirschhorn, Miami, Fla., for defendant Ehrling.

Bruce W. Keihner, West Palm Beach, Fla.

Robert T. Wright, Mershon, Sawyer, Johnston, Dunwoody & Cole, Miami, Fla., for defendants Askew, Scharffenberger, Pyne, Hatch, Clark, Jr., Manley, Brinckerhoff, Simons.

Howard Weinberg, Davis Markel & Edwards, Miami, Fla., Steven M. Edwards, Davis Markel & Edwards, New York City, for defendant David Brown.

James D. Wing, Alice Lash, Fine, Jacobson, Schwartz, Nash & Block, Miami, Fla., for defendant Mozian.

Bruce Angiolillo, Simpson Thacher & Bartlett, New York City, for defendants PaineWebber, Inc., Merrill Lynch Pierce Fenner & Smith, Inc., Merrill Lynch Capital Markets.

Ronald B. Ravikoff, Frederick W. Sall, Zuckerman, Spaeder, Taylor & Evans, Miami, Fla., for defendant Zdon.

Gilbride, Heller & Brown, P.A. by Lewis N. Brown, Linda H. Gottlieb, Miami, Fla., Seward & Kissel by Mark Hyland, John A. Shutkin, Associate General Counsel, KPMG Peat Marwick, New York City for KPMG Peat Marwick.

## MEMORANDUM AND ORDER

McKENNA, District Judge.

Currently pending before this Court are motions arising out of the Class Action Complaint ("Harold Menowitz, on behalf of himself and all others similarly situated, v. David F. Brown et al.") filed in the Southern District of New York on January 25, 1991.[1] The Complaint alleges violations of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act" or the "1933 Act"), 15 U.S.C. §§ 77k and 77o, Sections 10(b) and 20 of the Securities Exchange Act of 1934 (the "Exchange Act" or "the 1934 Act"), 15 U.S.C. §§ 78j(b) and 78t(a), Rule

1. By order dated October 23, 1991, this action was consolidated for pretrial proceedings, pursuant to Fed.R.Civ.P. 42, with *Stanton Sprizler, on behalf of himself and all others similarly situated, v. David F. Brown et al.*, No. 91–1722 (LMM) (the *"Sprizler"* Action"), and with *Drooker v. PaineWebber, Inc., et al.*, S.D. Florida, C.A. No. 91–0483 (the *"Drooker"* Action"). The *Sprizler* Action was commenced by the filing of a complaint in the Southern District of New York on March 12, 1991. The Court is unaware of the date on which the *Drooker* Action, originally filed in the District Court for the Southern District of Florida, was commenced.

10b–5 promulgated thereunder, and the common law. Plaintiff's motion for an order certifying the class pursuant to Rule 23 of the Federal Rules of Civil Procedure having been deferred, the Court in this Memorandum and Order addresses motions submitted on behalf of the individual defendants and Defendant KPMG Peat Marwick seeking dismissal of the Complaint. For the reasons that follow, the Defendants' motions are granted and the Complaint is dismissed in its entirety.

*Background*

The following description of the parties and recital of the factual background of this matter is drawn from the allegations of the Complaint. General Development Corporation ("GDC" or "the Company") is a residential, commercial and industrial real estate developer incorporated in the State of Delaware and headquartered in Miami, Florida. The Complaint alleges that GDC, which filed for Chapter 11 bankruptcy protection on April 6, 1990, is or was engaged in the development, offering, and sale of homesites and other properties located primarily in the state of Florida, and also in the construction and sale of single and multi-family housing, for which GDC provided mortgage financing to purchasers through a subsidiary called GDV Financial Corporation ("GDV" or "GDVFC"). GDC is or was a reporting company registered with the Securities and Exchange Commission (the "SEC") pursuant to the Securities Exchange Act, and the Complaint alleges that, at all relevant times, the bonds issued by the Company pursuant to the public offering that is the subject of the action were traded on the New York Stock Exchange. GDC, having filed for bankruptcy protection, is not a party to this lawsuit.

Plaintiff Harold Menowitz is a purchaser of approximately $450,000 (face value) in bonds issued by The Company in a $110 million public offering (the "Offering") of 12⅞% Senior Subordinated bonds (the "Bonds"). The Bonds were issued pursu-

ant to a registration statement (the "Registration Statement"), which included a prospectus dated April 8, 1988 (the "1988 Prospectus").

The individually named defendants (hereinafter collectively the "Individual Defendants") served as senior officers and/or directors of GDC at all relevant times, and were the signatories of assorted documents publicly disseminated by the Company.[2] The Complaint alleges that, as of December 31, 1988, Defendants Brown, Ehrling, Askew, Clark, Simons, Brinckerhoff, Hatch, Manley, Pyne and Scharffenberger owned shares of GDC common stock ranging in number from 200 to 357,258. Directors of the Company, and members and chairmen of the various Committees of the Board, received annual fees for their services, and each director received stock appreciation rights and was entitled to the equivalent of $2,500 per annum in tax advice and tax preparation assistance. According to the allegations of the Complaint, "[b]y reason of their stock ownership, management positions and/or membership on GDC's Board of Directors, the Individual Defendants were "controlling persons" of GDC within the meaning of Section 15 of the Securities Act, [15 U.S.C. § 77*o* ], and Section 20 of the [Securities] Exchange Act, [15 U.S.C. 78t(a) ]."

Defendants PaineWebber, Inc. ("PaineWebber") and Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") (hereinafter collectively the "Underwriter Defendants") were the underwriters in connection with the Offering. The Complaint alleges that "[t]he Underwriter Defendants purportedly conducted or participated in 'due diligence' investigations into the business, operations and prospects of GDC as part of their responsibilities as underwriters of the offering, and participated in the preparation of the Registration Statement and 1988 Prospectus."

Defendant KPMG Peat Marwick ("Peat Marwick"), a partnership of certified public

---

**2.** The Complaint alleges that Defendant Peter R. Brinckerhoff became a member of GDC's Board of Directors in March 1986 and was serving on the Audit Committee as of the time the Com-

plaint was filed. Defendant Brinckerhoff is alleged to have signed the Registration Statement as well as the 1988 Annual Report to Shareholders.

accountants, was engaged by the Company to provide independent auditing review during the period relevant to this action. The Complaint alleges that Peat Marwick authorized the inclusion in the 1988 Prospectus of unqualified opinions regarding GDC's financial statements for the four month period ending December 31, 1985, and for the years ending December 31, 1986, and December 31, 1987. Peat Marwick also participated in the filing of the Registration Statement, including the 1988 Prospectus, and in the dissemination of assorted other documents issued to the investing public and to GDC shareholders.

Plaintiffs' recital of GDC's activities during the purported class period, comprising forty-five pages and ninety-six paragraphs of the Complaint, is summarized here only briefly. In essence, Plaintiffs allege that certain documents issued and disseminated by the Company during the purported class period (April 8, 1988 through March 17, 1990), including the 1988 Prospectus as well as Quarterly and Annual Reports to shareholders and other publicly disseminated filings following the issuance of the 1988 Prospectus, misrepresented the Company's financial position and prospects, and contributed to the artificial inflation of GDC bonds.

As factual background, Plaintiffs allege that for over seven years between 1982 and 1989, GDC was engaged in a "comprehensive and far reaching scheme" to solicit and consummate sales of Florida properties to unsophisticated purchasers, usually out-of-state residents with limited education and little or no experience in real estate. Potential customers would frequently be flown to Florida at GDC's expense, met at the airport by GDC sales representatives, and shepherded through the Company's "one-stop" shopping process, whose object was to minimize exposure to outside sources of information and assure the eventual sale of GDC properties at highly inflated rates. In furtherance of its "fraudulent selling practices," GDC allegedly provided customers with appraisals that substantially overestimated the value of GDC properties, encouraged the financing of purchases through GDC subsidiary GDV, and—until 1987, when the practice was halted following discovery by the Federal National Mortgage Association (the "FNMA")—contrived to maintain as current mortgages issued by GDV that would otherwise have gone into default, triggering GDC's buy-back obligations under the terms of its agreements with certain institutional purchasers of GDV-originated mortgages. The Complaint alleges further that GDC systematically breached sales contracts providing for the reimbursement to defaulting purchasers of certain percentages of monies previously paid the Company, and that this practice—along with the Company's failure to honor certain contractual obligations concerning the completion of homesites and homesite improvements—resulted in extensive potential liability in connection with lawsuits filed on behalf of large numbers of disgruntled purchasers of GDC properties.

Plaintiffs' essential argument in support of their federal securities and common law fraud claims is that purchasers of GDC Bonds during the purported class period were injured by the inadequacy of the Company's disclosures with respect to the existence, scope, and potential repercussions of the activities outlined above. The substantive allegations of the Complaint fall into three broad categories:

(1) *Misrepresentations about GDC's "competitive advantage and business acumen"*: Plaintiffs allege that GDC's public filings in connection with the Offering were materially false and misleading insofar as increases in the Company's reported revenues and income, as well as other successes, were described as the result of GDC's "competitive advantage" and the superior "business acumen" of its sales force. As Plaintiffs would have it, the Company's public filings should have revealed that revenues and income were artificially inflated as a result of GDC's illegal selling practices and would not be maintainable following the eventual discovery and cessation of those practices.

(2) *Failure to disclose the "true nature" of pending litigation:* Plaintiffs allege that representations by the Company

in its public filings to the effect that various lawsuits undertaken on behalf of dissatisfied GDC customers were believed by the Company to be without merit and unlikely to have any material adverse effect on GDC's business or financial condition were materially false and misleading insofar as the Company knew, or was reckless in not knowing, that these lawsuits had merit and might result in substantial liability for the Company. Similarly, Plaintiffs allege that the Company misled the investing public by representing that it knew of no grounds for criminal proceedings against GDC, its subsidiaries, or their officers, and they assert that Defendants should have taken (or should have disclosed their failure to take) "reserves" in anticipation of potential awards to plaintiffs in pending lawsuits against the Company and potential liability in connection with ongoing criminal and regulatory investigations.

(3) *Failure to disclose the extent of the Company's contractual obligations to refund monies:* Plaintiffs allege that the publicly filed documents issued by GDC in connection with the Offering omitted disclosures—which had been included in documents previously filed by the Company—concerning the extent of GDC's obligation to refund certain monies, including, *inter alia*, refunds to defaulting purchasers of homesites and monies potentially owing for GDC's failure to complete developments.

*Motions to Dismiss*

The Individual Defendants seek dismissal of the action as against them pursuant to Rules 12 and 9(b) of the Federal Rules of Civil Procedure, urging, in the alternative, that Plaintiffs' federal securities law claims are time-barred, and that in any event Plaintiffs have failed adequately to allege certain substantive elements of their federal and common law claims.[3] The Individual Defendants argue that the Complaint, predicated on Plaintiffs' backward reasoning from GDC's eventual bankruptcy and the indictment of several of its officers and directors, constitutes a pleading of "fraud

by hindsight"; they urge dismissal on grounds that the failure to predict the events leading to GDC's demise is not actionable as a matter of law, that complete and appropriate disclosures were included in the Company's public filings during the relevant period, and that Plaintiffs have alleged neither reliance nor causation with the particularity required of pleadings that sound in fraud.

Defendant Peat Marwick argues similarly that Plaintiffs' federal securities claims are time-barred by the applicable statute of limitations and that pendent (now "supplemental") jurisdiction over the common law fraud claims should not be found on this record. Even assuming, *arguendo*, the timeliness of Plaintiffs' federal claims, Peat Marwick urges dismissal of Counts III, IV, V, and VII of the Complaint, alleging primary and secondary violations of federal securities laws under the 1933 and 1934 Acts, as well as common law fraud and deceit, as follows:

1) With respect to Count III, which asserts claims under Section 11 of the 1933 Act, Peat Marwick seeks dismissal on the grounds that Plaintiffs fail to plead compliance with the applicable limitations period, fail to attribute specifically to Peat Marwick any allegedly misleading information publicly filed or disseminated in connection with the Registration Statement, and improperly include allegations of wrongdoing subsequent to publication of the 1988 Prospectus.

2) With respect to Counts IV and V, which assert claims under Section 10 of the 1934 Act and Rule 10b–5 promulgated thereunder, Peat Marwick seeks dismissal on the grounds that Plaintiffs fail to allege fraud with particularity against Peat Marwick, and fail adequately to allege reliance, causation, and scienter. Insofar as Count IV includes an allegation of aiding and abetting under Section 10, Peat Marwick argues both that Plaintiffs omit to allege the required element of substantial assistance and that they erroneously predicate

---

**3.** Individual Defendants also move pursuant to Fed.R.Civ.P. 12(f) to strike Paragraphs 37, 40, 97, 98, and 101–105 of the Complaint.

liability upon an alternative allegation of recklessness or actual knowledge. Insofar as Count V includes an allegation that Peat Marwick violated a duty to correct false information contained in the 1988 Prospectus (and elsewhere) pursuant to Section 10, Peat Marwick argues that no such duty could have arisen under the facts alleged in the Complaint and that, in any event, Plaintiffs particularize neither the misrepresentations allegedly attributable to Peat Marwick nor the moment at which a duty to correct or to disclose false information purportedly arose.

3) With respect to Count VII, which alleges common law fraud and deceit, Peat Marwick argues that the Complaint fails to plead fraud with particularity, and fails to allege reliance by Plaintiffs on any particular misrepresentation or omission attributable to Peat Marwick.[4]

*The Time Bar Issue*

Applicable Limitations Periods

The limitations period applicable to actions brought pursuant to Section 11 of the 1933 Act is set forth in Section 13, 15 U.S.C. § 77m, which provides that

> [n]o action shall be maintained to enforce any liability created under section 77k ... of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence.... In no event shall any such action be brought to enforce a liability created under section 77k ... of this title more than three years after the security was bona fide offered to the public....

The timeliness of Plaintiffs' claims as measured by the three-year prong of Section 13 is undisputed. With respect to the one-year prong, Defendants take the position that Plaintiffs' Section 11 claims are time-barred insofar as Plaintiffs were on inquiry notice of the alleged fraud over one year before the filing of the Complaint that commenced this action. Defendants urge also

that Plaintiffs' cause of action for alleged violations of Section 10(b) of the 1934 Act is similarly barred by the analogous standard applicable to those claims.

In opposition to the contention that their federal securities law claims are time-barred by the applicable limitations periods, Plaintiffs argue vigorously that, with respect to the claims under Section 10(b) of the 1934 Act, the one- and three-year limitations period for which Defendants argue is not analogous to the one set forth in Section 13 of the 1933 Act quoted above; rather, Plaintiffs say, an action brought under Section 10(b) of the 1934 Act must be considered timely unless brought more than three years after the transaction complained of or more than one year after *actual* notice or discovery of the facts that give rise to a plaintiff's claim: because inquiry notice does not start the running of the clock on claims under Section 10(b), in Plaintiffs' view, those counts of the Complaint asserting violations of 15 U.S.C. 78j(b) are timely and should be sustained. Even if inquiry notice will suffice to trigger the one-year limitations period for claims arising under Section 10(b), Plaintiffs further contend, the determination whether inquiry notice has occurred is one of mixed law and fact inappropriate for consideration on a motion to dismiss; alternatively, Plaintiffs argue that such a determination—if deemed appropriate here— must be made without reference to anything external to the pleadings in the case. Finally, Plaintiffs urge that they were not, in fact, on inquiry notice of the facts giving rise to the federal securities claims asserted in the Complaint, and that their claims under Section 11 of the 1933 Act and Section 10(b) of the 1934 Act, as well as the derivative claims asserting "controlling person" liability under Sections 15 and 20 of the 1933 and 1934 Acts, should for that reason be sustained. Plaintiffs' arguments are unpersuasive.

---

**4.** Defendants PaineWebber and Merrill Lynch join in the motions of Peat Marwick and the Individual Defendants seeking dismissal of the Complaint, and move—pursuant to Fed.R.Civ.P.

12(c)—for judgment on the pleadings dismissing as against them Counts I, IV and VII of the Complaint.

In *Ceres Partners v. GEL Associates,* 918 F.2d 349 (2d· Cir.1990), the Second Circuit announced a uniform one- and three-year limitations period for private rights of action implied under Sections 10(b) and 14 of the 1934 Act. *Ceres Partners* was followed in short order by *Welch v. Cadre Capital,* 923 F.2d 989 (2d Cir.1991) ("*Welch I*"), *vacated and remanded sub nom., Northwest Savings Bank v. Welch,* — U.S. ——, 111 S.Ct. 2882, 115 L.Ed.2d 1048 (1991), in which the Circuit declined to apply the new limitations period retroactively in the circumstances of that case, and eventually by the decision in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* — U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), in which the Supreme Court adopted as the standard for claims brought pursuant to Section 10(b) the one- and three-year period set forth in Section 9(e) of the 1934 Act, 15 U.S.C. § 78i(e), and appears to have indicated, — U.S. at —— ——, 111 S.Ct. at 2785–2788 (O'Connor, J., dissenting), that the limitations period would be applied retroactively. *Welch I* was remanded for reconsideration in light of *Lampf* and *James B. Beam Distilling Co. v. Georgia,* — U.S. ——, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991), and, on remand, the Second Circuit "bowed," as it later pointed out, "to the force of *Lampf* and *Beam* and applied the new limitations period retroactively to bar the *Welch* complaint." *Henley v. Slone,* 961 F.2d 23, 24–25 (2d Cir.1992) (citing *Welch v. Cadre Capital,* 946 F.2d 185 (2d Cir.1991) ("*Welch II*")).

The story does not end with *Welch II.* On December 19, 1991, Congress enacted the Federal Deposit Insurance Corporation Improvement Act of 1991, of which Section 476 provides that "[t]he limitation period for any private civil action implied under section 10(b) of [the 1934 Act] that was commenced on or before June 19, 1991, shall be the limitation period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991." Federal Deposit Insurance Corporation Improvement Act of 1991, Pub.L. No. 102–242, § 476, 1991 U.S.C.C.A.N. (105 Stat.) 2236. Section 476 operates to reinstate certain actions dismissed under *Lampf* which were filed before the date of that decision and were timely under the statute of limitations then in effect.

The instant action having been commenced in January 1991, Plaintiffs' claims under Section 10(b) are governed by the limitations period in effect in this Circuit on June 19, 1991, which was the one and three-year period announced in *Ceres Partners.* As the Circuit has recently made clear, the retroactive application of the one- and three-year rule announced in *Ceres Partners* depends on whether or not it would be equitable, under *Welch I,* to apply that rule to a suit whose timeliness would otherwise have been determined by a state law limitations period. *See Henley,* 961 F.2d at 26. Happily, the decision in *Ceres Partners,* already over two months old as of the filing of the Complaint in this action, applies squarely here, and the retroactivity issue does not arise. Plaintiffs themselves do not dispute *Ceres Partners'* authority with respect to the timeliness of their claims under Section 10(b).

■ Plaintiffs correctly note that the *Ceres Partners* Court did not specifically address the inquiry notice question, and the standard it adopted was the one provided in the 1934 Act for express rights of action under Sections 9(e) and 18(a), not the differently worded limitation provision articulated in Section 13 of the 1933 Act.[5] Plain-

---

5. As previously noted, the one-year prong of Section 13 expires "one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by exercise of reasonable diligence...." 15 U.S.C. § 77m. The limitations provisions for actions under Sections 9 and 18 of the 1934 Act do not contain the same inquiry notice reference; an action under Section 9(e) of the 1934 Act must be brought "within one year after the discovery of the facts constituting the violation and within three years after such violation," 15 U.S.C. § 78i(e), and an action under Section 18(a) of the 1934 Act must be brought "within one year after the discovery of the facts constituting the cause of action and within three years after such cause of action accrued." 15 U.S.C. § 78r(c). *See Lampf,* — U.S. at — n. 9, 111 S.Ct. at 2782 n. 9 (noting that the various limitations periods of the 1934 Act "differ slightly in

tiffs' actual notice argument, however, seems clearly mistaken: the Circuit's recent recapitulation of the *Ceres Partners* rule describes "a uniform limitations period of the earlier of one year from the date the fraud was *or reasonably should have been* discovered or three years from the date of the transaction." *Henley*, 961 F.2d at 24 (emphasis added). Not only, therefor, must Plaintiffs' Section 10(b) claims be evaluated (like their claims under Section 11 of the 1933 Act) in light of the one-year prong of the applicable limitations period: the Court must also consider Defendants' contention that information contained in the 1988 Prospectus and other documents publicly filed by GDC more than one year before this action was commenced in January 1991 should have alerted Plaintiffs to the possibility of fraudulent activity and should now, accordingly, preclude their federal claims.[6]

Scope of the Court's Inquiry

As previously noted, Plaintiffs argue that the determination whether they were on notice of the alleged fraud is one of

---

terminology," and selecting the language contained in Section 9(e) as the standard for actions under Section 10(b)).

**6.** The foregoing analysis applies equally to the instant suit and to the *Sprizler* Action, which was commenced in the Southern District of New York, but its applicability to the *Drooker* Action, commenced outside of this jurisdiction and transferred here, is less clear. Although the Second Circuit did once note in dictum that the substantive law of the Fifth Circuit would apply in a federal action commenced in the Northern District of Texas and transferred by the Judicial Panel on Multidistrict Litigation, *Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402, 408 n. 7 (2d Cir.1975), that dictum is not consistently followed by the District Courts of this Circuit, *see Center Cadillac, Inc. v. Bank Leumi Trust Co.*, No. 1991 Civ. 7776, 1992 WL 357602, at *5–*7 (S.D.N.Y.1992); *Duke v. Touche Ross & Co.*, 765 F.Supp. 69, 73 (S.D.N.Y.1991), and it has been disapproved by commentators on grounds that the rule of *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964) (substantive law of transferor state applies after transfer pursuant to 28 U.S.C. 1404(a)), should not affect a transferee court's application of *federal* law. *See* Richard L. Marcus, *Conflicts Among Circuits and Transfers Within the Federal Judicial System*, 93 Yale L.J. 677 (1984). Judge Friendly took *Van Dusen* "to be limited to

mixed law and fact inappropriate for consideration on a motion to dismiss; in any case, they say, such a determination should be made—if made at all—with reference to nothing that is not contained in the Complaint, incorporated by reference therein, or annexed as an exhibit thereto.

Plaintiffs not inappositely cite *Cosmas v. Hassett*, 886 F.2d 8 (2d Cir.1989), and *Goldman v. Belden*, 754 F.2d 1059 (2d Cir.1985), for the latter proposition, but they mischaracterize the current status of the law. The Second Circuit has most recently made clear that consideration of documents publicly filed by defendants in securities cases is not foreclosed to district courts deciding motions to dismiss: "Despite *Cosmas* and *Goldman*, it is highly impractical and inconsistent with Fed.R.Evid. 201 to preclude a district court from considering such documents when faced with a motion to dismiss a securities action based on allegations of material misrepresentations or omissions." *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir.1991). *See also Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991) ("Where plaintiff

---

choices of *state* law," Hon. Henry J. Friendly, *The "Law of the Circuit" and All That*, 46 St. John's L.Rev. 406, 412 (1972) (emphasis in original), and several circuit opinions have adopted his view. *See, e.g., In re Korean Air Lines Disaster*, 829 F.2d 1171, 1175–76 (D.C.Cir.1987), *aff'd on other grounds sub nom., Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989); *In re Pittsburgh & L.E.R. Co. Sec. & Antitrust Litig.*, 543 F.2d 1058, 1065 n. 19 (3d Cir.1976). The Second Circuit has recently noted its agreement with the principle that "a 'transferee court [should] be free to decide a federal claim in the manner it views as correct without deferring to the interpretation of the transferor circuit.'" *In re Pan American Corp.*, 950 F.2d 839, 847 (2d Cir.1991) (quoting *In re Korean Air Lines Disaster*, 829 F.2d at 1174).

The parties are directed to brief the issue of whether the law that determines the timeliness of the *Drooker* Plaintiffs' claims under Section 10(b) of the 1934 Act is the law that existed in this or another jurisdiction on June 19, 1991. Any party taking the position that the applicable law is *not* that of the Second Circuit is further directed to set forth "the limitation period provided by the laws applicable in the [relevant] jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991." Pub.L. No. 102–242, § 476.

has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint[,] the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated."), *cert. denied,* —— U.S. ——, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992).

As for the appropriateness of the inquiry notice determination in the context of the motion to dismiss, the Court does not concur in Plaintiffs' estimation of the dangers said to inhere in such an enterprise. Other courts have of course undertaken it, *see Korwek v. Hunt,* 646 F.Supp. 953, 958–59 (S.D.N.Y.1986), *aff'd,* 827 F.2d 874 (2d Cir. 1987); *Landy v. Mitchell Petroleum Technology Corp.,* 734 F.Supp. 608, 618 (S.D.N.Y.1990); *Pomeroy v. Schlegel Corp.,* 780 F.Supp. 980, 982–84 (W.D.N.Y. 1991), and Plaintiffs' citation of one instance in which a judge of this District declined to do so on the particular record before him is not persuasive authority for the general proposition Plaintiffs seek to advance.[7] Because "[t]he test as to when fraud should with reasonable diligence have been discovered is an objective one," *Armstrong v. McAlpin,* 699 F.2d 79, 88 (2d Cir.1983), a court's determination that the information available to a plaintiff in a given instance should (or should not) have given him reason to consider and investigate the probability of fraud is surely warranted in appropriate cases; at very least, it cannot absolutely be precluded.

**Were Plaintiffs on Notice of the Alleged Fraud?**

■ A casual perusal of the publicly filed 1988 Prospectus, the 1988 Annual Report to Shareholders (the "1988 10–K") and the Quarterly Reports for 1989—covering the periods ending 6/30/89 and 9/30/89— (the "1989 10–Q's") suffices to reveal the facts and circumstances that must surely have alerted a person of ordinary intelligence to the probability of fraud. *See Armstrong,* 699 F.2d at 88.

In brief, the 1988 Prospectus reveals— *inter alia*—a substantial and increasing number of civil cases pending against the Company and certain of its officers; the pendency of two purported class actions alleging breaches of homesite installment sales contracts; the commencement of a non-public Federal Trade Commission ("FTC") investigation of the Company's appraisal practices in connection with mortgage financing of housing constructed by the Company; the service upon the Company and GDVFC of a subpoena by the office of the United States Attorney for the Southern District of Florida seeking information in connection with a Grand Jury investigation of the Company's appraisal practices; and the seizure by representatives of the New Jersey Real Estate Commission and New Jersey Attorney General of books and records located in GDC offices in Elizabeth, Clifton, and Jersey City, New Jersey, in connection with suspected violations of the New Jersey Real Estate License Act and regulations promulgated thereunder.

The 1988 10–K reveals the certification of a class action entitled *Stanislaus v. General Development Corp.* (the *"Stanislaus"* action) on behalf of approximately 25,000 defaulting purchasers of GDC homesites, and the continuing pendency of (1) a

---

7. *See* Plaintiffs' Memorandum in Opposition at 82 (citing *Epstein v. Haas Securities Corp.,* 731 F.Supp. 1166 (S.D.N.Y.1990)). Nor is the Court inclined to agree with Plaintiffs' suggestion that "[t]he *Landy* decision is of questionable validity in light of the overwhelming rulings to the contrary." (Pls.' Mem. in Opp'n at 83 n. 45 and accompanying text, citing cases from the Eighth and Ninth Circuits, and from the District Courts of Minnesota, Michigan, and Pennsylvania.) *Klein v. Goetzmann,* 770 F.Supp. 78 (N.D.N.Y. 1991), mis-cited by Plaintiffs at Page 99 of their Memorandum (and mis-designated by them as an action in the Southern District of New York), does indeed contain language to the effect that the question "when the plaintiffs discovered or should have discovered fraud ... is inherently fact-based, and could almost never be answered by the allegations in the pleadings." 770 F.Supp. at 84. The Court reads the quoted language in *Klein* as being intended to suggest only that the question is rarely determinable on the face of pleadings alone, and not that it is inappropriate to consider it either where the pleadings do clearly indicate the untimeliness of the action, or where the record on the motion to dismiss includes publicly filed documents replete with information that should have alerted a reasonable plaintiff to the likelihood of fraud.

purported class action entitled *Love v. General Development Corp.* (the *"Love"* action) on behalf of approximately 34,000 purchasers of GDC homesites; (2) civil litigation against the Company, GDVFC, and certain of GDC and GDVFC's officers, including actions involving allegations of fraud and racketeering in connection with the sale of GDC housing; (3) the FTC's investigation of GDC's business and marketing practices; (4) a federal Grand Jury investigation of GDC's appraisal practices; and (5) investigations by the New Jersey Attorney General's Office and by the New Jersey Real Estate Commission.

Forms 10–Q for the periods ending June 30 and September 30, 1989 also reveal the continuing pendency of the *Stanislaus* and *Love* actions; the existence (as of September 30) of approximately eighty housing fraud cases alleging unfair sales practices, fraud and racketeering; the ongoing nature of the federal Grand Jury investigation; the service on GDC of two additional subpoenas by the office of the United States Attorney for the Southern District of Florida; and the commencement of a new action against the Company—filed in federal court in New Jersey on behalf of approximately 3,000 separate plaintiffs—alleging, *inter alia,* misrepresentations and fraudulent sales practices in connection with the sale of GDC homesites, and violations of the Federal Organized Crime Control Act, the Interstate Land Services Full Disclosure Act, and various state and federal securities laws.

The 1988 Prospectus

Under the heading "Pending Litigation," Paragraph 7 of the "Investment Considerations" section of the 1988 Prospectus reveals that:

> The Company is experiencing an increasing volume of litigation relating to claims in connection with its community development activities, including delays in the completion of improvements beyond contractually required time periods. Certain of these actions purport to be brought on behalf of a class of purchasers which is far broader than the actual complaints received from homesite or home purchas-

ers. Although the Company believes these actions generally to be without merit and defends them vigorously, they are time-consuming, expensive to defend and unpredictable in their ultimate outcome. See "Business—Legal Proceedings."

(1988 Prospectus at 10.)

The "Legal Proceedings" section to which the above-quoted paragraph makes reference is located at pages 30 through 32 of the 1988 Prospectus and comprises seven single-spaced paragraphs detailing pending litigation against and involving the Company, as well as the status of various pending investigations of its operations in several jurisdictions. Thus, for example, the second paragraph of that section reveals that the *Stanislaus* Action was commenced by service of a complaint on August 1, 1985 in the Circuit Court of the Eleventh Judicial Circuit for Dade County, Florida, that the plaintiff in that action seeks recovery of payments under a homesite sales contract cancelled by the Company upon the plaintiff's failure to make required installment payments, that the suit was brought as a purported class action on behalf of defaulting purchasers under installment sales contracts for homesites in GDC's Florida Communities, that the complaint alleges breach of contract and seeks equitable relief, including an accounting and compensatory damages, as well as interest, costs, and attorneys fees, and that a Special Master appointed by the court recommended certification of *Stanislaus* as a class action. The paragraph ends with a disclaimer to the effect that "[t]he Company opposes the present action, maintains it is without merit and is defending it vigorously. The Company does not expect the action to have any material adverse effect on its business or financial condition." (Prospectus at 30.)

Following the description of the *Stanislaus* action appears a similarly detailed description of the *Love* action, in which it is revealed that the complaint in that suit was filed on February 2, 1987, that the plaintiff seeks declaratory and injunctive relief and damages, individually and as a purported

representative of other purchasers, based on a claim that GDC failed to complete certain homesite developments within the time periods required under homesite installment sales contracts, and that the Circuit Court of the Eleventh Judicial Circuit for Dade County, Florida, has indicated its intention to certify a class action and has issued an order accepting the plaintiff's proposed class definition. The Paragraph ends with a disclaimer to the effect that "[a]lthough the Company believes this action to be without merit and will defend the action vigorously, it is unable to predict at this time the ultimate outcome of the litigation." (Prospectus at 31.)

Descriptions of other actions against the Company pending in the Eleventh Judicial Circuit clearly indicate the multiplicity of suits alleging "misrepresentations by the Company, GDVFC and certain officers of the Company in connection with the sale of its homes." Each of the paragraphs detailing such actions ends with the formulaic disclaimer that "[t]he Company believes th[ese] action[s] to be without merit and will defend the[se] action[s] vigorously." (Prospectus at 31.)

Finally, the "Legal Proceedings" section includes the following description of investigations undertaken by the FTC, the New Jersey Real Estate Commission, and the Attorney General of New Jersey:

In May 1987, the Company was advised by the Staff of the Federal Trade Commission that it had commenced a nonpublic investigation of the Company's appraisal practices in connection with mortgage financing of housing constructed by the Company for its homesite purchasers. In addition, on April 5, 1988, the Company and GDVFC were served with a Subpoena by the United States Attorney for the Southern District of Florida in connection with a Grand Jury investigation of the Company's appraisal practices. The Subpoena seeks extensive information concerning the appraisal of homes constructed by the Company in its Port St. Lucie, Port Malabar, Port Charlotte/North Port and Silver Springs Shores communities from 1982 to date. The Subpoena also seeks information

concerning the Company's dealings with institutional purchasers of its mortgage loans, including Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation. It is the Company's policy to cooperate with all governmental agencies with respect to inquiries relating to the Company's business affairs.

. . . .

On November 10, 1987, representatives of the Real Estate Commission and Attorney General of New Jersey entered and searched the offices of the Company in Elizabeth, Clifton and Jersey City, New Jersey and seized certain books and records. That action was apparently undertaken in connection with an investigation of whether the offices were operating in compliance with the New Jersey Real Estate License Act and regulations thereunder. The Company believes its operations are conducted lawfully in every jurisdiction in which it is engaged in the sale of real estate and will vigorously defend any resultant action.

(Prospectus at 31.)

The 1988 10-K

Like the 1988 Prospectus, the 1988 10-K includes a "Legal Proceedings" section comprising several single-spaced pages detailing civil suits filed against the Company as well as ongoing criminal and regulatory investigations into its business practices. These paragraphs, which purport to summarize the most significant of various legal proceedings against and involving the Company, are preceded by a general disclaimer to the effect that: "[t]he Company is a party to certain legal proceedings, none of which singly or in the aggregate is expected to have a material adverse effect on its business or financial condition." (1988 10-K at 16.)

Extensive quotation from the "Legal Proceedings" section of the 1988 10-K is not warranted since much of the information contained therein is similar or identical to information contained in the analogous section of the 1988 Prospectus and de-

scribed above. The following differences, however, are worthy of note:

(1) The 1988 10–K reveals that the plaintiff's motion for class certification has been granted in the *Stanislaus* action, that the Company has appealed the class certification order and expects oral argument on the issue to be held in the second quarter of 1989, and that an order has issued permitting the plaintiff in that action to notify other members of the purported class, at his own expense, of the pendency of the lawsuit. The paragraph detailing developments in the *Stanislaus* action also notes that the Company has taken the position that it is not contractually obliged to refund payments to defaulting purchasers because "the damages sustained by the Company as a result of such defaults exceeded the total principal amounts paid," and it reiterates the familiar disclaimer to the effect that "[t]he Company opposes the present action, maintains it is without merit and is defending it vigorously." (1988 10–K at 16.)

(2) With respect to the *Love* action, the 1988 10–K reveals that the purported class of plaintiffs in that suit consists of approximately 34,000 purchasers of GDC properties, that the Company's answer to the complaint includes defenses of impossibility of performance, waiver, immateriality, and cure, that an earlier class certification order was vacated on August 12, 1988, and that the plaintiffs are appealing the order vacating the class certification. Like the paragraph describing the *Stanislaus* action, the paragraph detailing developments in the *Love* action reiterates the disclaimer quoted above.

(3) The 1988 10–K identifies by name five lawsuits pending against the Company in the Circuit Court of the 11th Judicial Circuit in and for Dade County, Florida, and reveals that fifty-seven related complaints have been filed in that jurisdiction. The 1988 10–K describes those actions as "virtually identical" and reports that they "charge the Company, GDVFC and certain officers of the Company and GDVFC with common law fraud and violations of Florida statutory provisions respecting fraud and

racketeering." (1988 10–K at 17.) The Report notes further that "the complaints allege that the named defendants were participants in a scheme intended to fraudulently induce plaintiffs to agree to purchase homes by misrepresenting or failing to disclose the value of those homes," (1988 10–K at 17), and that a ruling on the defendants' motions to dismiss the complaints has been deferred. The Paragraph detailing the status of these sixty-two complaints ends with the disclaimer quoted above.

(4) With respect to the FTC inquiry into the Company's business and marketing practices, the 1988 10–K reports that the Company has "substantially complied," pursuant to agreement with the FTC, with the Commission's requests for information, and that it has received no further communications from the FTC since October 1988. The paragraph detailing the status of the FTC investigation ends with a disclaimer to the effect that "[t]he Company believes that there are no grounds for pursuing an investigation of the Company or to support charges against the Company for unfair or deceptive trade practices." (1988 10–K at 18.)

(5) With respect to the Grand Jury investigation in the Southern District of Florida, the 1988 10–K reveals that, as of August 12, 1988, the Company had fully complied with the subpoenas served upon it by the United States Attorney's Office for the Southern District of Florida and had met with representatives of that office in July 1988 "to explain the documentation provided pursuant to the subpoenas and to seek a resolution of what the Company believes to be an unfounded investigation." (1988 10–K at 18.) The paragraph detailing the status of the Grand Jury investigation concludes with a disclaimer to the effect that "[a]lthough the Company does not know the exact nature of the charges being considered, the Company believes that there are no grounds for pursuing any charges or commencing any criminal proceedings against the Company, GDVFC or any of their officers or employees."

(6) With respect to the New Jersey Real Estate Commission and Attorney General's

investigation, the 1988 10–K reiterates much of the information contained in the 1988 Prospectus, including the observation that "[t]he Company believes that its operations are conducted lawfully in every jurisdiction in which it is engaged in the sale of real estate...." The Paragraph detailing the status of the New Jersey investigations also reports the Company's belief that "there are no grounds for pursuing the investigation," notes that the Company "is currently engaged in discussions with representatives of the Real Estate Commission and the Attorney General's office to resolve the matter," and concludes with a disclaimer to the effect that "[t]he Company does not expect any such resolution to have any material adverse effect on its business or financial condition." (1988 10–K at 19.)

(7) The 1988 10–K identifies by name three actions described as putative stockholder class actions filed in the Delaware Court of Chancery in and for New Castle County, Delaware. Plaintiffs in those cases are described as seeking preliminary and permanent injunctive relief, including, in one case, an accounting for damages, in connection with allegations that "the Company's directors breached their fiduciary duties by refusing to negotiate a proposal to acquire the Company and in adopting a stockholder rights plan and approving severance compensation agreements for certain officers of the Company." The paragraph devoted to the description of the Delaware actions concludes with a disclaimer to the effect that "[t]he Company opposes the present actions, maintains they are without merit and intends to defend them vigorously." (1988 10–K at 19.)

The 1989 10–Q's

The "Legal Proceedings" sections of the 1989 10–Q's for the second and third quarters of 1989 (periods ending 6/30/89 and 9/30/89) disclose the following additional information:

1) With respect to the housing cases filed in the Eleventh Judicial Circuit in and for Dade County, Florida, the 1989 10–Q for the period ending 6/30/89 (the "1989 10–Q 2d") reveals the existence of approximately seventy cases "filed by the same counsel who have instituted many lawsuits against the Company." The complaints in these cases are characterized as "essentially identical" and are described as involving allegations that the Company

sold houses for amounts in excess of their fair market value and engaged in a variety of fraudulent practices related thereto, including common law fraud and deceit, mortgage fraud, breach of the implied covenant of good faith and the conduct of a pattern of racketeering activity in violation of the Florida RICO statute.

(1989 10–Q 2d at 13.) The 10–Q states that "[d]iscovery taken by the Company has revealed that the uniform allegations made in each of these complaints is not supported by the evidence in many of the cases," notes that the Company's motion for summary judgment in the earliest filed action was granted on July 6, 1989, and concludes with the observation that

The Company believes there are good grounds to support the defenses asserted by it in most of the cases and that these defenses should be sufficient in law to avoid any judgment. The Company intends to pursue additional summary judgment motions ... in those cases where discovery indicates that the case may be summarily disposed of. The Company intends to continue its cooperation with the Chief Mediator to settle those cases where settlement appears the appropriate and most economical method of disposition.

(1989 10–Q 2d at 13.)

The 10–Q for the period ending 9/30/89 reiterates much of the foregoing information, reports the existence of approximately eighty housing fraud cases, notes that the granting of summary judgment in favor of the Company in the earliest filed of such cases has been appealed by plaintiffs in that action, and reports that settlements have been reached in nine of the housing cases. The 10–Q for this period also reveals that summary judgment motions in the nature of the motion determined in favor of the Company have been filed in

seven cases currently scheduled for trial, and that two of those motions have been denied.

2) With respect to the Grand Jury investigation in the Southern District of Florida, the 1989 10–Q's reveal that additional subpoenas directed at GDC's marketing practices were received by the Company in April 1989 and that, "in accordance with its established practices, the Company is cooperating fully with the investigation." (1989 10–Q 2d at 14.) The 10–Q's reiterate the formulaic phrase contained in GDC's previously filed documents to the effect that "[a]lthough the Company does not know the exact nature of the charges the U.S. Attorney's office is considering, the Company believes that there are no grounds for commencing any criminal proceedings against it or GDV Financial." (1989 10–Q 2d at 14.) [8]

3) With respect to the *Stanislaus* action, the 1989 10–Q's reveal the failure of GDC's appeal from the certification of the plaintiff's case as a class action, and report that potential class members are being notified of the pendency of the action. The 10–Q's reiterate the disclaimer to the effect that "[t]he Company maintains the *Stanislaus* action is without merit and is defending it vigorously." (1989 10–Q 2d at 14; 1989 10–Q 3d at 15.)

4) With respect to the *Love* action, the 1989 10–Q for the period ending 9/30/89 reports that a decision is expected shortly on plaintiffs' appeal of the order vacating certification of the class, and it reiterates the *Stanislaus* disclaimer quoted immediately above.

5) Finally, the 1989 10–Q for the period ending 9/30/89 reveals the pendency of a new lawsuit against the Company, filed in the United States District Court for the District of New Jersey on behalf of approximately 3,000 separate plaintiffs, alleging misrepresentations and fraudulent sales practices in connection with the Company's sales of homesites and certain houses in its Florida communities. The 1989 10–Q describes the New Jersey lawsuit in the following terms:

> The complaint alleges violations of the Federal Organized Crime Control Act and similar state statutes, the Interstate Land Sales Full Disclosure Act and various Federal and state securities laws. The complaint seeks compensatory and punitive damages and an award of treble damages as well as attorneys fees. The complaint is the result of solicitation by a resident of New Jersey who engages in promoting litigation for personal profit. This individual has plead [sic] guilty to Federal securities violations, has been found to have misapplied plaintiffs' funds in similar situations in the past and is the subject of an earlier action by the Company charging him with defamation and improper solicitation.... On October 31, 1989, the Company moved to dismiss the complaint in its entirety. The Company maintains [that] the [New Jersey] action is without merit and is defending it vigorously.

(1989 10–Q 3d at 16.)

Analysis

Plaintiffs' contention that the Prospectus and SEC filings do not, as a matter of law, contain information sufficient to have placed investors on inquiry notice of the Company's allegedly fraudulent activities is difficult to fathom in light of the voluminous disclosures summarized and quoted immediately above, and Plaintiffs' argument that the Company's filings actually omitted material information is ultimately irrelevant to the inquiry notice determination. Although the 1988 Prospectus may indeed omit to disclose, for example, the contractual provisions upon which the complaint in the *Stanislaus* action purports to be founded and the potential extent of the Company's exposure in connection with that and other lawsuits, the sheer volume of pending litigation and regulatory and criminal investigations revealed in the 1988

---

**8.** The 1989 10–Q for the period ending 9/30/89 reads slightly differently, as follows: "Although the Company does not know the exact nature of the charges the U.S. Attorney's office is investi- gating, the Company believes that there are no grounds for criminal proceedings against it or GDV Financial." (1989 10–Q 3d at 15.)

Prospectus and subsequently filed documents could not have failed to alert an investor of ordinary intelligence to the probability of fraud and the advisability of inquiry. Even assuming that the information contained in the documents filed by the Company and disseminated to investors in connection with the Offering was materially misleading in several respects—and that material information was omitted from those documents and withheld from actual and potential investors in violation of common and/or federal law—it appears to this Court beyond cavil that no reasonable adult reader of the 1988 Prospectus and later filed documents could have remained in ignorance of the likelihood that something was severely amiss at GDC. This conclusion is altered neither by the Company's reiteration, throughout its SEC filings, of formulaic disclaimers down-playing the significance of the lawsuits filed against it and asserting its intention to defend itself vigorously in both civil and criminal proceedings, nor by the consistency of Bond trading prices throughout the period following the publication of the 1988 Prospectus. Assuming—in the context of their opposition to the motions to dismiss—the truth of Plaintiffs' contention that Bond trading prices remained relatively steady during the months following dissemination of the 1988 Prospectus and through most of 1989, Plaintiffs were not entitled to rely upon that fact in the face of the volume of information available to them that suggested the likelihood of fraud.

▮ Plaintiffs' evocation of the doctrine of equitable tolling to redeem their otherwise untimely federal securities claims is unavailing. The tolling of a statute of limitations based on allegations that a plaintiff's cause of action has been fraudulently concealed during the limitations period has been described as involving three elements: "(1) the wrongful concealment by the defendant of its actions, (2) the failure by plaintiff to discover the operative facts underlying the action within the limitations period, and (3) plaintiff's due diligence in trying to discover the facts." *Dymm v. Cahill*, 730 F.Supp. 1245, 1255–56 (S.D.N.Y.1990) (citations omitted). Al-

though a plaintiff's allegation that the concealment of a fraud was active and purposeful will relieve him of the obligation to establish his diligence in discovering the basis for his cause of action, *Farr v. Shearson Lehman Hutton, Inc.*, 755 F.Supp. 1219, 1228 (S.D.N.Y.1991), such allegation must include specific details of activities undertaken by the defendant to keep an already completed fraud from being discovered. *Friedman v. Arizona World Nurseries Ltd.*, 730 F.Supp. 521, 544 (S.D.N.Y.1990), *aff'd*, 927 F.2d 594 (2d Cir.1991). Thus, for example,

> [i]f plaintiffs allege that discovery of the fraud was delayed by the actions of a particular defendant, they must set forth in the complaint the essential facts supporting such allegations[,] ... [and] the complaint must show that a particular defendant "took positive steps *after the commission of the initial fraud* to keep it concealed."

*Id.* (citing *Krome v. Merrill Lynch and Co.*, 637 F.Supp. 910, 914 (S.D.N.Y.1986) (emphasis added)).

In the instant case, Plaintiffs assert that GDC and the Individual Defendants actively concealed the fraudulent activities underlying Plaintiffs' cause of action by repeatedly emphasizing the superior acumen of GDC sales representatives, by denying the merits of pending litigation against the Company, and by omitting from the 1988 Prospectus paragraphs included in a previously issued prospectus (the "1985 Prospectus") that would have been necessary to make the 1988 Prospectus not materially misleading. In reliance on the rule previously stated, Plaintiffs make no effort to allege diligence in the discovery of the purported fraud: "[b]ecause the active concealment through blatant written denials of fraudulent behavior occurred throughout the 1988 Prospectus, [the 1988] 10–K, and [the] 1989 10–Q's," they say, "[P]laintiffs are relieved of having to demonstrate any due diligence in uncovering the fraud." (Pls.' Mem. in Opp'n at 102.)

▮ The problem with Plaintiffs' equitable tolling argument is that it refers to no

allegations of the Complaint detailing activities engaged in by the Defendants to disguise their wrongdoing *after* the completion of the purported fraud. Instead of pointing to "positive steps [undertaken] after the commission of the initial fraud to keep it concealed," *Friedman*, 730 F.Supp. at 544, Plaintiffs purport to demonstrate active concealment through a reiteration of the same list of representations and omissions—including the absence from the 1988 Prospectus of information included in the 1985 Prospectus, the misrepresentations about the sources of certain financial successes, and the inadequate disclosures and misleading assurances concerning the merits of pending litigation and investigations—that is alleged to constitute the fraud itself. Equitable tolling, however, applies only where the fraud constituting the basis of a plaintiff's cause of action is undiscoverable by him during the statutory period because of steps undertaken by the defendant actively to conceal it. Plaintiffs' misunderstanding of this standard is manifest in their argument that "the Complaint in this case is replete with allegations of conduct ... which clearly constitute [sic] affirmative actions to conceal GDC's pervasively wrongful business practices...." (Pls.' Mem. in Opp'n at 100) (emphasis omitted): It is of course not the concealment of GDC's business practices, but rather the concealment of the fraud purportedly contained in the 1988 Prospectus and other GDC filings, that would support Plaintiffs' invocation of the equitable tolling doctrine and entitle them to relief.

*Summary*

For all of the foregoing reasons, the motions to dismiss of all Defendants are granted on grounds that Plaintiffs' claims pursuant to the federal securities laws are untimely, the Complaint in this action having been filed after the expiration of the applicable statutory limitations periods.[9] There being no independent basis of federal subject matter jurisdiction to support the non-federal claims asserted in the Complaint, the Court declines, pursuant to 28 U.S.C. § 1367(c) (Supp.1991) (effective Dec. 1, 1990) to exercise supplemental jurisdiction over those claims, and the Complaint is dismissed in its entirety.

SO ORDERED.

---

9. Having so determined, the Court does not address other arguments offered in support of the various motions to dismiss. Similarly, the Court does not address Plaintiffs' Motion for Class Certification (or Peat Marwick's motion for permission to file an "enlarged" forty-eight page memorandum of law in opposition to the Motion for Class Certification), as these motions have become moot.